# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

JOE BERNARD NOWELL, JR.                                    PLAINTIFF
ADC #179135

V.                         No. 4:19CV00444-JTR

GARY STEWART, Doctor,
Faulkner County Detention Center, *et al.*                 DEFENDANTS

## MEMORANDUM AND ORDER

### I.      Introduction

Plaintiff Joe Bernard Nowell, Jr. ("Nowell") initiated this action while he was a pretrial detainee at the Faulkner County Detention Center ("FCDC").[1] Construed together, his *pro se* § 1983 Complaint, Addendum, and Amended Complaint, alleges that Defendants violated his constitutional rights and committed medical malpractice.[2] *Docs. 2, 3, 9.* Nowell sued the Defendants in their personal capacity only. *Doc. 9 at 2.*

---

[1]Nowell is now an inmate in the Arkansas Department of Corrections, serving a sentence of Life Without Parole for Capital Murder.

[2]The Court has read Nowell's *pro se* pleadings, together, as constituting his claims. *See Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014) (*pro se* complaint must be "liberally construed" and "*pro se* litigants are held to a lesser pleading standard than other parties"); *Kiir v. N.D. Pub. Health,* 651 F. App'x 567, 568 (8th Cir. 2016) (amendment "intended to supplement, rather than to supplant, the original complaint," should be read together with original complaint).

Nowell alleges that, when he arrived at the FCDC in September 2018, he had a "serious injury" to his right arm and shoulder, with 85% paralysis. According to Nowell, Defendants Gary Stewart, M.D. ("Dr. Stewart") and Nurse Monte Munyan ("Munyan") failed to provide adequate medical care for: (1) his arm injury, which resulted in his arm and hand becoming "crippled" and "useless"; (2) the back injury he suffered later in a slip and fall on a wet floor; and (3) his psychological issues. *Doc. 2 at 4-10, 17-18; Doc. 3 at 6-9, 13-17; Doc. 9 at 4-8.*

Nowell also alleges that: (1) Defendant Corporal Lisa Phillips ("Phillips") failed to properly administer his medications, and falsely reported that he was refusing medications (*Doc. 9 at 6-7, 14*); (2) Dr. Stewart discontinued all medications for Nowell's physical and psychological conditions in May/June 2019, based in part on Phillips' false reports (*Doc. 2 at 10-15; Doc. 3 at 10-14; Doc. 9 at 9*); and Defendants Phillips and the FCDC were responsible for his fall, on March 25, 2019. *Doc. 3 at 4-5, 13-14, 17; Doc. 9 at 7-8, 11-12.*

Finally, Nowell alleges a medical malpractice claim against Dr. Stewart.

In previous Orders, the Court dismissed all of Nowell's claims against the FCDC and Munyan, and Nowell's "slip and fall" claim against Phillips. *Docs. 14, 15, 34.* Accordingly, Nowell's remaining claims are inadequate medical care claims against Dr. Stewart related to the treatment he provided for the injuries to Nowell's arm, back, and mental health issues; inadequate medical care claims against Dr.

Stewart and Phillips for the way they administered his medications; and a state law medical malpractice claim against Dr. Stewart.

Phillips and Dr. Stewart have now filed Motions for Summary Judgment, Statements of Undisputed Facts, and Briefs in Support arguing that all of Nowell's remaining claims against them should be dismissed with prejudice.[3] *Docs. 35, 36, 37, 40, 41, & 42.* Nowell filed a Response to Defendants Statement of Facts and a Declaration. *Docs. 46 & 47.* Defendant Dr. Stewart filed a Reply. *Doc. 48.*

For the following reasons, Defendants' Motions for Summary Judgment (*Docs. 35 & 40*) are GRANTED, and all of Nowell's remaining claims are DISMISSED, with prejudice.

## II. Discussion

### A.    Relevant Facts Giving Rise to Nowell's Claims

1.    Nowell alleges that on September 8, 2018, when police arrived at his home, he was "uninjured" in bed, but near death due to taking "way too many pills."

---

[3]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

On his way to the hospital in an ambulance, an EMT repeatedly bent his arm "way far backward." *Doc. 2 at 4.*

2.     Nowell also alleges that on September 11, 2018, a doctor at the hospital ordered an orthopedic consultation. *Doc. 9 at 5.*

3.     Nowell remained in the hospital until his release on September 21, 2018, at which time he was arrested and booked into the FCDC. *Doc. 42 at ¶1.*

4.     During his initial health screening in the FCDC, medical staff confirmed prescriptions for Quetiapine (Seroquel), Lisinopril, Trazodone, Bactrim, and Keflex. *Doc. 42-4 at 1.* In accordance with FCDC practice, staff immediately filled the prescriptions. *Doc. 42-6 at 1.*

5.     On September 27, 2018, Dr. Stewart examined Nowell's right arm and shoulder in response to his complaints of pain.[4] Dr. Stewart reviewed Nowell's medications and found no need to change the plan of care for his mental health issues. Dr. Stewart understood that Nowell had required recent hospitalization for a serious drug overdose. He noted Nowell's right arm injury, with continuing neurological signs and symptoms, and assessed that the symptoms would "need to heal naturally as outside intervention would not accelerate the healing and/or

---

[4]In his pleadings, Nowell alleges that, on September 25, 2018, Dr. Stewart refused to treat his right arm injury or refer Nowell for orthopedic treatment. *Doc. 9 at 4.* In any event, Nowell's medical records make it clear Dr. Stewart examined him shortly after Nowell complained of right arm and shoulder pain.

improve the recovery." *Doc. 42-6 at 1-2*. Dr. Stewart noted that the arm injury was "not addressed as an active commodity in the hospital reflecting that there was no emergent or urgent need at [that] time for anything greater than expectant management." *Doc. 42-6 at 2*. Nowell was "displeased with this assessment and [Dr. Stewart's] decision not to prescribe the use of the antipsychotic Seroquel." *Doc. 42-6 at 2*.

6.     Dr. Stewart stated he disfavored use of Seroquel in jail due to its high abuse rate by prisoners. Instead, he prescribed Prozac for Nowell. *Doc. 42-4 at 2; Doc. 42-6 at 2*.[5] He discontinued Nowell's blood pressure medication because his readings were within normal limits, while off his medication, which supported Dr. Stewart's decision that Nowell no longer required it. *Doc. 42-6 at 2.*

7.     Medical records establish that, on October 3, 2018, Dr. Stewart saw Nowell and found his hand looked "great, no change in range of motion or strength."[6] *Doc. 42-6 at 2*. Dr. Stewart gave Nowell a seven day script for Ibuprofen for "arm pain/fibromyalgia complaints." *Doc. 42-4 at 3-4; Doc. 42-6 at 2*. Nowell

---

[5]Based on Nowell's continuing complaints about the Prozac, Dr. Stewart later prescribed Seroquel. *Doc. 46 at 6.*

[6]In his pleadings, Nowell alleges that, on October 2, 2018, Dr. Stewart again refused to treat his right arm injury or refer Nowell for orthopedic treatment. *Doc. 9 at 4.* This statement is either false or Dr. Stewart promptly saw Nowell after not being able to see him on October 2.

states he had no range of motion and no hand strength, with limited movement only in a couple of his fingertips. *Doc. 46 at 5.*

8.   On February 20, 2019, Dr. Stewart authorized refills of Prozac, Quetiapine, Lisinopril, and Trazodone. *Doc. 42-4 at 5; Doc. 42-6 at 2.*

9.   On March 25, 2019, Nowell slipped and fell on a wet floor, injuring his back. He claims that Phillips risked further injury to Nowell by helping him up, leaving him in an old visitation room for 1.5 hours, and denying him access to a doctor until March 28, 2019. *Doc. 9 at 7-8.*

10.   On March 27, 2019, Dr. Stewart gave Nowell a script for Ibuprofen for fourteen days. *Doc. 42-4 at 6.*

11.   The next day, Dr. Stewart saw Nowell for his "slip and fall." The assessment was major depressive disorder, general anxiety disorder, night terrors, and low back pain. *Doc. 42-4 at 7-9.* Because Nowell's hand had now "atrophied and contracted," Dr. Stewart placed him on prednisone "in an attempt to stabilize any neurological damage that he might be having." *Doc. 42-6 at 3.* Dr. Stewart also ordered Risperidone and requested Nowell's previous medical records. *Doc. 42-4 at 7-9.*

12.   On April 22, 2019, Nowell noted the prednisone "did make [his] hand swell and temporarily relieve[d] some of the pain . . .". He could not open his hand all the way, but was doing hand stretches and would "have to try harder." *Doc. 46*

*at 8.* Nowell stated, "maybe another round of prednisone would help if [Dr. Stewart] thinks so." *Doc. 46 at 8.*

13.   On April 25, 2019, Nowell saw Dr. Stewart for a follow up appointment for back and right hand pain. Dr. Stewart noted Nowell still had right hand atrophy. *Doc. 42-6 at 3-4.* Dr. Stewart prescribed Naproxen for twenty-one days. *Doc. 42-4 at 10-12.*

14.   On May 2, 2019, Nowell told Dr. Stewart that the naproxen was working "pretty good" and he "would rather take the naproxen for pain, [thanks]." *Doc. 46 at 9.*

15.   On May 14, 2019, Nowell's Prozac, Quetiapine, Lisinopril, and Trazodone was returned, with "noncompliance" written below Nowell's name. Apparently, because Nowell was being noncompliant in taking these medications, they were temporarily "discontinued." *Doc. 42-4 at 14-16.*

16.   Nowell admits he stopped taking Prozac due to "heart pain", which he complained about, and stopped taking Lisinopril because Dr. Stewart doubled his prescription without seeing him or checking his blood pressure. *Doc. 9 at 6-7.*

17.   On May 15, 2019, Nowell completed a sick call request stating that his condition was worsening without his medications. *Doc. 42 at ¶23.* Nowell also wanted another script for prednisone as it "helped [him] a lot with [his] hand [and] arm." *Doc. 46 at 11.*

18.    On May 17, 2019, Nowell completed another sick call request stating that he had not seen the doctor. Munyan indicated Dr. Stewart "had to cancel sick call [and Nowell would] see him next week." *Doc. 42 at ¶24; Doc. 46 at 11.*

19.    On May 23, 2019, Dr. Stewart saw Nowell for a "Medication refill request Antisocial." *Doc. 42-4 at 14-16.* Dr. Stewart noted Nowell had been found to be hoarding Risperdal, Prozac, and Lisinopril. *Doc. 42-6 at 4.* Dr. Stewart ordered prednisone and paroxetine, and submitted another request for Nowell's medical records. *Doc. 42-4 at 14-16.*

20.    After Dr. Stewart discontinued the scripts for Risperdal, Prozac, and Lisinopril, because Nowell was discovered to be hoarding those medications, Nowell complained that he "did not know what [paroxetine] was and was not going to take it." *Doc. 9 at 9.* Nowell admits that he later decided to take the paroxetine prescribed by Dr. Stewart, after finding out what it was; but Phillips denied him the medication and falsified medical logs to state that Nowell refused to take it. *Doc. 9 at 9.*

21.    On June 25, 2019, Nowell filed the Complaint and Addendum initiating this lawsuit. *Docs. 2 & 3.*

22.    On August 29, 2019, Phillips left her position at the FCDC. *Doc. 42 at ¶33; Doc. 46 at 15.*

23.     On November 21, 2019, FCDC officials searched Nowell's cell and found over 60 Prozac tablets, along with additional prescribed medications that he was hoarding. *Doc. 42-4 at 18.*

24.     The same day, Dr. Stewart saw Nowell and noted medication hoarding. He prescribed an injection of Fluphenazine, a long-acting antipsychotic, and a script for Prozac. *Doc. 42-4 at 19-21; Doc. 42-6 at 4-5.*

25.     Nowell indicated he stopped taking his medications because they either did not work or were causing side effects. *Doc. 46 at 9-11, 16-17.* According to Nowell, Dr. Stewart prescribed this new medication to "punish" him for not taking the other medications he had prescribed. Nowell states Dr. Stewart "tried to kill [Nowell] with" the medications he prescribed. *Doc. 46 at 17.*

26.     Dr. Stewart saw Nowell on December 12, 2019, for chronic care and swelling of Nowell's right hand. *Doc. 42-6 at 5.* Dr. Stewart prescribed Furosemide and potassium chloride. *Doc. 42-4 at 22-23, 27.*

27.     On December 16, 2019, Nowell submitted a medical call request stating that Dr. Stewart had prescribed Prozac but Nowell refused to take it because of "bad side effects." He requested Paxil instead of Prozac. *Doc. 46 at 17-18.*

28.     On December 19, 2019, Dr. Stewart saw Nowell for chart review and noted continued antisocial behavior. Dr. Stewart opined that Nowell had not been on his mental health medication long enough for it to become effective. *Doc. 46 at*

*17-18.* Dr. Stewart ordered naproxen for Nowell's back and shoulder pain. *Doc. 42-4 at 24-26.*

29.     On March 3, 2020, Nowell required emergency treatment for dysphagia, a worsening difficulty swallowing liquids, solids, and pills. *Doc. 42-4 at 40-55.* He had no focal neurological deficits or other acute findings. The recommendation was outpatient evaluation by endoscopy or a swallow evaluation. *Doc. 46 at 30.*

30.     By November 2020, medical records show Nowell had "full use of his right arm and hand." *Doc. 42-4 at 123-124; Doc. 42-6 at 8-9.* Nowell expressed his opinion that "I do not have full use of my hand and arm now." *Doc. 46 at 33.*

31.     Dr. Stewart saw Nowell on December 10, 2020, and found he had "100% range of motion" with his right hand. *Doc. 42-4 at 123-124; Doc. 42-6 at 8-9.* Nowell agreed with this assessment. *Doc. 46 at 33.*

32.     Phillips states she never refused to give Nowell his medications. *Doc. 42 at ¶19.* Nowell disputes this assertion by alleging Phillips would quietly pass his cell without giving him his medications. *Doc. 46 at 10.* Nowell makes no effort to square that conclusory allegation with the undisputed fact that he was found to have a large hoard of pills in his cell, which would have been dispensed by Phillips and others during pill call.

33.     Phillips also states that she never falsified medication records. *Doc. 46 at 10*. Nowell again disputes that assertion, alleging that Phillips did in fact falsify medication records. *Doc. 46 at 10.* To support his assertion, Nowell attached one of the many medication administration record forms used at the FCDC. On this form, Nowell wrote "proof of falsification?" with arrows toward a few notations that in no way support Nowell's claim that Phillips falsified his medical records. *Doc. 46 at 48.*

**B.     Nowell's Inadequate Medical Care Claims Against Dr. Stewart and Phillips**

"Prison officials violate the Due Process Clause of the Fourteenth Amendment when they show deliberate indifference to a pretrial detainee's objectively serious medical needs." *Ivey v. Audrain County, Mo.*, 968 F.3d 845, 848 (8th Cir. 2020) (citing *Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020)). "To establish a constitutional violation, a [pretrial] detainee must demonstrate an objectively serious medical need that the defendant[s] knew about and deliberately disregarded." *Morris*, 954 F.3d at 1058.

When Dr. Stewart first examined Nowell, on September 27, 2018, he noted Nowell's right arm injury had continuing neurological signs and symptoms. *Doc. 42-6 at 1*. Dr. Stewart understood that Nowell had required recent hospitalization for a serious drug overdose and had been prescribed medications for his serious mental health issues. *Doc. 42-6 at 1-2*. Viewing these facts in a light most favorable to

11

Nowell, his pre-existing right arm injury and mental impairments were objectively serious medical needs, which Dr. Stewart knew about and consistently treated while Nowell was a prisoner in the FCDC.

On March 25, 2019, Nowell slipped and fell, injuring his back. *Doc. 9 at 7-8.* The record lacks any medically diagnosed back injury beyond lower back pain. Still, Dr. Stewart recognized this back pain required treatment and, on March 27, 2019, prescribed Ibuprofen for fourteen days. *Doc. 42-4 at 6.* Arguably, this back injury was also an objectively serious medical need. *See De Rossitte v. Correct Care Sols., LLC.,* 22 F.4th 796, 802 (8th Cir. 2022)("An objectively serious medical need is one that either has been 'diagnosed by a physician as requiring treatment' or one 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'")(references omitted).

Apart from establishing an objectively serious medical need, Nowell must also demonstrate that Dr. Stewart and Phillips *knew of, but were deliberately indifferent to* his serious medical needs. *See Saylor v. Nebraska, 812* F.3d 637, 644 (8th Cir. 2016)(To establish an inadequate medical care claim, an inmate must show that: (1) he had an objectively serious medical need; and (2) a defendant subjectively knew of, but was deliberately indifferent to, that serious medical need); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010)(same). Proving "deliberate indifference" requires more than evidence of negligence, or even gross negligence, and a

prisoner's mere disagreement with the course of care prescribed by his medical providers is *not* sufficient to establish or support a claim of "deliberate indifference." *Id*.; *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). Instead, deliberate indifference "requires proof of a reckless disregard of the known risk." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001). In other words, "there must be actual knowledge of the risk of harm, followed by deliberate inaction amounting to callousness." *Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998).

### 1. Dr. Stewart's Treatment of Nowell's Arm Injury

After Nowell arrived at the FCDC, Dr. Stewart evaluated Nowell's arm injury and determined it would "need to heal naturally as outside intervention would not accelerate the healing and/or improve the recovery." *Doc. 42-6 at 1-2*. Dr. Stewart noted the arm injury was "not addressed as an active commodity in the hospital reflecting that there was no emergent or urgent need at [that] time for anything greater than expectant management." *Doc. 42-6 at 2*. When the condition worsened, Dr. Stewart prescribed prednisone "in an attempt to stabilize any neurological damage that he might be having." *Doc. 42-6 at 3*.

Nowell noted the prednisone "temporarily relieve[d] some of the pain . . ." and he was doing hand stretches and would "have to try harder." *Doc. 46 at 8.* By November 2020, medical records show Nowell had "full use of his right arm and hand." *Doc. 42-4 at 123-124; Doc. 42-6 at 8-9*. Nowell disagrees with that

assessment, as of November 2020 (*Doc. 46 at* 33), but goes on *to agree* with Dr. Stewart's assessment that by December 10, 2020, Nowell had "100% range of motion" with his right hand. *Doc. 42-4 at 123-124; Doc. 42-6 at 8-9*; *Doc. 46 at 33.*

These undisputed facts do not come close to demonstrating that Dr. Stewart was deliberately indifferent to Nowell's need for medical treatment for his arm injury. The medical records and Dr. Stewart's Affidavit make it clear he provided regular and appropriate medical care for Nowell's arm injury and it ultimately resulted in the injury resolving itself. Accordingly, Dr. Stewart is entitled to summary judgment on this claim.

### 2. Dr. Stewart's and Phillips' Treatment of Nowell's Back Pain

Nowell's "slip and fall," on March 25, 2019, caused him back pain. *Doc. 9 at 7-8.* He makes the entirely conclusory and factually unsupported allegation that Phillips risked further injury to Nowell's back by helping him up, leaving him in an old visitation room for 1.5 hours, and denying access to a doctor until March 28, 2019. *Doc. 9 at 7-8.* Importantly, there was never any medically diagnosed injury to Nowell's back. Nothing about Nowell's factually unsupported allegations about Phillips' alleged actions support her ever being "deliberately indifference" to his complaints of *low back pain*. Accordingly, Phillips in entitled to summary judgment on that claim.

On March 27, 2019, Dr. Stewart prescribed Ibuprofen for fourteen days. *Doc. 42-4 at 6.* The next day, Dr. Stewart saw Nowell and noted low back pain. The majority of that visit focused on Nowell's arm injury. *Doc. 42-6 at 3*.

On April 25, 2019, Nowell saw Dr. Stewart for a follow up appointment for back and right hand pain. *Doc. 42-6 at 3-4.* Dr. Stewart ordered Nowell's previous medical records and prescribed Naproxen for twenty-one more days. *Doc. 42-4 at 10-12.*

On May 2, 2019, Nowell noted the naproxen was working "pretty good" and he "would rather take the naproxen for pain, [thanks]." *Doc. 46 at 9.* On December 19, 2019, Dr. Stewart saw Nowell for chart review and again ordered naproxen for back and shoulder pain. *Doc. 42-4 at 24-26.*

There is nothing in the record which suggests that Nowell's *back pain* required anything other than over the counter pain medication, which Dr. Stewart provided. Furthermore, the treatment provided by Dr. Stewart resolved Nowell's complaints of back pain. Thus, because Nowell has failed to demonstrate that Dr. Stewart was deliberately indifferent to his complaints of back pain, Dr. Stewart is entitled to summary judgment on that claim.

### 3. Dr. Stewart's Treatment of Nowell's Mental Health Issues

When Dr. Stewart first saw Nowell, he knew he was already taking prescription medication for his serious mental health issues. *Doc. 42-6 at 1-2.* Dr.

Stewart found no change was needed to Nowell's plan of care for his mental health issues, except altering one of his prescribed medications.

Dr. Stewart stated he disfavored use of Seroquel in jail due to the high abuse rate by prisoners. In lieu of Seroquel, Dr. Stewart prescribed Prozac. *Doc. 42-4 at 2; Doc. 42-6 at 2.* Nowell was "displeased with this assessment and [Dr. Stewart's] decision not to prescribe the use of the antipsychotic Seroquel." *Doc. 42-6 at 2.* Dr. Stewart later prescribed Seroquel, on a consistent basis, apparently because it proved to be more effective than Prozac. *Doc. 46 at 6.*

On May 14, 2019, Nowell's Prozac, Quetiapine, Lisinopril, and Trazodone were returned with "noncompliance" written below Nowell's name. For that reason, Dr. Stewart temporarily discontinued those medications.[7] *Doc. 42-4 at 14-16.* Nowell admits that voluntarily stopped taking Prozac due to "heart pain", which he complained about, and voluntarily stopped taking Lisinopril because Dr. Stewart doubled his prescription without seeing him or checking his blood pressure. *Doc. 9 at 6-7.* Importantly, all of those decisions were made *by Nowell* and were contrary to the prescribed medical treatment that Dr. Stewart believed Nowell needed.

The next day, on May 15, 2019, Nowell filed a sick call request stating his condition was worsening without his medications. *Doc. 42 at ¶23.* On May 17, 2019,

---

[7] Obviously, Nowell later began receiving his prescribed medications, as evidenced by FCDC officials searching his cell on November 21, 2019, and finding over 60 Prozac tablets, along with various other medications prescribed by Dr. Stewart. *Doc. 42-4 at 18.*

Nowell filed another sick call request asking why he had not seen the doctor. Munyan indicated Dr. Stewart "had to cancel sick call [and Nowell would] see him next week." *Doc. 42 at ¶24*; *Doc. 46 at 11.*

On May 23, 2019, Dr. Stewart saw Nowell for a "Medication refill request Antisocial." *Doc. 42-4 at 14-16.* Dr. Stewart noted Nowell had been found to be hoarding Risperdal, Prozac, and Lisinopril. *Doc. 42-6 at 4.* Dr. Stewart issued Nowell a script for prednisone, paroxetine, and Prozac, and prescribed an injection of Fluphenazine, a long-acting antipsychotic. *Doc. 42-4 at 19-21; Doc. 42-6 at 4-5.* Nowell states that this was an attempt by Dr. Stewart to "punish" him for not taking his prescribed medications and that Dr. Stewart "tried to kill [Nowell] with" one or more of these medications. *Doc. 46 at 17.*

Viewing these facts in a light most favorable to Nowell, they establish that *he* was responsible for creating the problems with his medications by either refusing to take them or, after his medications were resumed, hoarding the pills, presumably for some illicit purpose. *Nothing* in the record establishes that Dr. Stewart was deliberately indifferent to Nowell's need for medication for his mental health issues. Rather, the facts establish Nowell was a noncompliant patient, who hoarded his prescription medications, and irrationally believed that Dr. Stewart was "punishing" him or trying to "kill him" with the medications he prescribed.

Nothing in the record supports Nowell's conclusory allegations that Dr. Stewart was deliberately indifferent to Nowell's need for prescription medications to treat his serious mental health issues. To the contrary, the undisputed facts establish that Dr. Stewart consistently gave his best efforts to treat Nowell's serious mental health issues by prescribing the medications he believed would provide Nowell with the most benefit. All of the problems Nowell later encountered with receiving and taking these medications *were of his own creation*.

Accordingly, Dr. Stewart is entitled to summary judgment on this claim.

### 4. Phillips' and Dr. Stewart's Administration of Nowell's Medication

Nowell makes conclusory and factually unsupported allegations that Phillips and Dr. Stewart wrongly denied him the medications he was supposed to receive. For example, he states that Phillips would quietly pass his cell, instead of stopping to deliver his medications. *Doc. 46 at 10*. This assertion is directly refuted by the subsequent search of Nowell's cell that resulted in guards finding a large hoard of Nowell's prescribed medications. In the same vein, Nowell alleges that Phillips falsified the medical logs to reflect Nowell refused his medications. *Doc. 9 at 9; Doc. 46 at 10*. This fanciful claim is flatly refuted by Nowell's own admission that he often refused to take his prescribed medications for a host of irrational reasons.

Nowell obviously disagreed with Dr. Stewart's treatment decisions regarding his prescribed medications. Disagreement with medical decisions, however, does not

support a claim of deliberate indifference. The law is well settled that a prison doctor remains free to exercise his or her independent professional judgment, and an inmate is not entitled to any particular course of treatment. *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008).

For all of the foregoing reasons, and the previous reasons given by the Court for denying Nowell's claim that Dr. Stewart provided inadequate medical care for his mental health issues, both Phillips and Dr. Stewart are entitled to summary judgment on Nowell's claim that they provided inadequate medical care in the way they prescribed and administered his medications.

**B.     Nowell's State Law Medical Malpractice Claim Against Dr. Stewart**

The record establishes that Dr. Stewart consistently treated Nowell's complex mental health issues and physical injuries over the many months he was a prisoner in the FCDC. Nothing about the appropriate "standard for medical care" required to treat those problems was "within the jury's common knowledge." Accordingly, at the summary judgment stage, Arkansas law requires Nowell to support his medical negligence claim with expert testimony about the appropriate "standard for medical care" and how Dr. Stewart's medical care deviated from that standard. *Robbins v. Johnson*, 367 Ark. 506, 512, 241 S.W.3d 747, 751 (2006). In Nowell's Response to Dr. Stewart's Motion for Summary Judgment on the malpractice claim, Nowell has

provided *no expert testimony* which is required to create a genuine issue of material fact on that crucially important issue.

In Dr. Stewart's Affidavit, he states that, in his professional medical judgment, the care he provided to Nowell at the FCDC was "appropriate and would have been effective had [Nowell] cooperated with the plan of care." *Doc. 42-6 at 9*. This expert medical testimony on the appropriate standard of care is undisputed.

When medical records and a physician affidavit indicate adequate care was provided, as established by the record in this case, an inmate cannot create a genuine issue of disputed material fact merely by stating his lay opinion that he believes he did not receive adequate medical treatment. *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). Accordingly, Dr. Stewart is entitled to summary judgment on Nowell's medical malpractice claim.

## II.  Conclusion

The undisputed facts establish that neither Dr. Stewart nor Phillips were deliberately indifferent to Nowell's need for medical care for his serious mental health issues, arm injury, or back pain. Likewise, under Arkansas law, Dr. Stewart is entitled to summary judgment on Nowell's medical malpractice claim.

IT IS THEREFORE ORDERED THAT Defendants' Motions for Summary Judgment (*Docs. 35 & 40*) be and are hereby GRANTED, and all of Nowell's claims

against Defendants Dr. Gary Stewart and Corporal Lisa Phillips are hereby

DISMISSED, WITH PREJUDICE.

DATED this 4th day of March, 2022.

_____
UNITED STATES MAGISTRATE JUDGE